UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

RAILYARD COMPANY, LLC,                                    Case No. 15-12386 t11

    Debtor.

In re:

RAILYARD BREWING COMPANY, LLC,                            Case No. 16-12829 t11

    Debtor.

# **OPINION**

    Before the Court are the chapter 11 trustee's motion to reject a lease, filed in case no. 15-12386, and the trustee's emergency motion for relief from stay, filed in case no. 16-12829. This opinion is issued in both cases because of the significant legal and factual overlap. The main dispute is whether the trustee should be allowed to reject a lease between his estate as lessor and the debtor in possession in case. no. 16-12829 as lessee. Having heard extensive testimony about the lease terms, the local market, the history of the lease, and other relevant information, the Court concludes that binding law requires it to approve the trustee's proposed rejection, and to modify the automatic stay accordingly. Nevertheless, the Court believes it may be in the interests of the lessor estate to enter into a new lease with the lessee estate, and will order the parties to mediate the issue.

I.     FACTS[1]

The lease at issue (as amended, the "Lease") involves two bankruptcy estates: debtor Railyard Company, LLC ("Railyard") is the landlord, and debtor Railyard Brewing Company, LLC ("RBC") is the tenant. Rick Jaramillo, Steve Duran, and David Duran are managing members of both companies. Historically, Mr. Jaramillo oversaw business operations while Steve Duran provided funding and performed needed construction work with the help of his brother, David Duran.

The members formed Railyard to construct and operate a large, multi-unit building at an abandoned rail station near downtown Santa Fe, New Mexico ("Market Station"). Market Station was built on property subject to a long-term ground lease with the Santa Fe Railyard Community Corporation ("SFRCC"). Several years ago a large condominium unit at Market Station was created and sold to the City of Santa Fe, to settle a dispute between Railyard and the city. Railyard's income comes from subleasing the remaining space. The anchor tenant, REI, leases about 28,300 square feet. There are also a number of smaller tenants.

RBC was formed to own and operate a family-oriented entertainment business on the second floor of Market Station, featuring a restaurant, bar, and eight bowling lanes (the "Bar/Restaurant"). RBC's members have never operated a similar business, but they have associated with experienced restauranteurs. The space to be used for the Bar/Restaurant is the subject of the Lease.

---

[1] In makings its findings, the Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket").

To refinance existing debt encumbering Market Station, in December 2014 Railyard obtained a $9,670,000 bridge loan from Thorofare Asset Based Lending Fund, III ("Thorofare"). Steve Duran made a $545,000 capital contribution to Railyard to facilitate the Thorofare loan closing. The loan agreement states that $520,000 would be set aside to fund tenant improvements, $300,000 of which could be used for the Bar/Restaurant. Buildout of the RBC Bar/Restaurant was at least 50% complete when Thorofare made the loan.

Within a month after the closing, Flying Star (a significant tenant) filed a chapter 11 bankruptcy case and moved out of Market Station. This was a major blow to the cash flow and refinancing plans of Railyard.

Around June 2015, Thorofare declared a default and refused to release any further funds for tenant improvements. Buildout of the Bar/Restaurant stopped, and the parties became embroiled in litigation. At the same time, Railyard was involved in an ongoing, significant dispute with REI over common area maintenance charges.

Railyard filed this chapter 11 case on September 4, 2015. About seven months later, the Court (Hon. Robert H. Jacobvitz) determined that cause existed to appoint a chapter 11 trustee. Craig Dill was appointed as the trustee in July 2016.

The trustee filed a motion to reject the Lease on August 18, 2016. The Court set a November 16, 2016 trial date on the proposed lease rejection. RBC moved to continue the trial at a hearing held November 4, 2016, but the Court denied the request.

Around the time the trustee filed the motion, RBC began working hard to finish the tenant improvements and open the Bar/Restaurant. In particular, Steve Duran spent a lot of time and money trying to finish the space. Mr. Duran and RBC knew they were taking a calculated risk, in view of the pending lease rejection motion.

On November 16, 2016, about 15 minutes after the start of the lease rejection trial, RBC filed its chapter 11 case. The trustee immediately filed an emergency motion for stay relief. The Court granted partial emergency stay relief to allow the hearing to proceed (which it did). The Court heard the balance of the stay motion on November 29, 2016.

The Lease was drafted by Rick Jaramillo in his capacity as a managing member of both Railyard and RBC. Originally, RBC leased the 17,000 square foot upstairs suite that houses the Bar/Restaurant (Suite 210), and a 4,100[2] square foot first floor suite (Suite 107). Suite 210 is right above a portion of REI's retail store and adjacent to the city's second floor condominium unit.

Railyard and RBC amended the Lease three times. The first amendment, dated November 20, 2014, states that the Lease shall commence on June 1, 2014, with all rent and common maintenance area obligations due on June 1, 2015.

The second amendment[3] was executed on May 1, 2015. It added Suite 110 to the lease, the former Flying Star location. The amendment provides that the lease of Suite 110 commences two hundred fifty (with the number 150 in parentheses) from the date of the amendment.

The third amendment,[4] signed and made effective on or about May 30, 2015, states that the Lease shall commence:

> 90 days after the full funding of equipment and working capital as outlined in the opening cost worksheet (see attached)[5] contemplated in the loan between Thorofare Capital and Railyard Co. LLC, and upon the full reimbursement to RBC LLC for

---

[2] The Court calculated this number using the figures from the trustee's Exhibit B and the testimony at trial. Exhibit B shows the total square footage for all three suites is 27,696, and that Suite 110 occupies 6,594 square feet. Testimony showed Suite 210 occupied about 17,000 square feet, so the balance is about 4,100 square feet.

[3] Erroneously titled "First Amendment to Lease Agreement."

[4] The document is entitled "second amendment," but the Court finds it was the third and final amendment.

[5] The worksheet lists items with a total cost of $239,687, including kitchen equipment, bar equipment, furniture, televisions, an audio system, computers, service items, advertising, and food and liquor inventory.

any construction costs provided by RBC LLC for a certificate of occupancy, and or any other cost associated with delays of funding the opening cost worksheet in the loan agreement between Thorofare Capital and Railyard Co.

The relationship between Railyard and Thorofare had broken down when Mr. Jaramillo and Mr. Duran signed the third amendment, the clear intent of which was to ensure that RBC would not have to pay rent until the dispute with Thorofare was resolved to Railyard's satisfaction.

As shown above, the Lease was not negotiated at arm's length. It contains a number of terms that are not commercially reasonable, including:

- There is no deadline for the Lease to commence and RBC to start paying rent, because the conditions to commencement are unlikely to occur. Thorofare has already applied the tenant-improvement funds to the loan balance, and Railyard's estate cannot afford to repay RBC for the tenant improvements, which exceed $100,000;

- There is no cap on the tenant improvements (or "TI") that Railyard is required to pay for, and no deadline for the TI to be completed. Even after Lease commencement, RBC could demand that Railyard provide additional TI work;

- There is no deadline for the Bar/Restaurant to begin operating, which violates the ground lease between Railyard and the SFRCC;

- The Lease does not require any personal guarantees or a security deposit, even though RBC is not a national "credit" tenant and has never operated a restaurant, bar, or bowling alley;

- The lease term is 20 years, with six ten-year options to renew. This gives RBC control over the leased premises for 80 years, a highly unusual term, especially for a start-up restaurant business;

-5-

- The rental rate only increases by 10% every five years. It is not commercially reasonable to lock in a rental rate for up to 80 years. Rather, an arms' length lease would allow periodic adjustments to the then-prevailing market rate;

The Lease also contains ambiguities. For example, the original document dated January 30, 2014 states the rent will not exceed "two hundred ten thousand dollars a year ($263,750)." The third amendment dated May 1, 2015 mislabels Suite 210 as Suite 110. There also is some ambiguity about whether the rental rate is $12.50 a square foot for all suites, or just Suite 210.

The trustee's decision to reject the RBC Lease was prompted by four main concerns. First, the trustee believes that, because of its unusual, tenant-friendly terms, the Lease would burden the estate for years before it generated rent. The trustee estimates that if RBC invoked every potential offset provision, it could avoid paying rent for up to 20 years.

Second, the trustee does not want to do business with RBC and its members. Mr. Jaramillo in particular has been difficult to deal with. He and the other Railyard members have fought with and/or sued REI; the City of Santa Fe; their original lender; Thorofare; Thorofare's counsel; SFRCC; Flying Star; Daniela's Closet (a tenant); Marvelous Hair Designs (another tenant); and the first proposed chapter 11 trustee. The trustee fears that a business relationship with an entity managed by Mr. Jaramillo is a recipe for frustration, litigation, and economic loss.

Third, the presence of a bowling on the second floor concerns REI and the City of Santa Fe. An REI representative testified that customers and employees are disturbed by noise coming from the bowling lanes (which are right above a portion of REI's premises). The Lease does not place any time restrictions on bowling (e.g. after normal retail hours only). While the Lease requires Railyard (instead of RBC) to provide "operating bowling lanes including sound attenuation modification as needed to satisfy quiet enjoyment provisions of other owners or tenants

-6-

of Market Station . . . .," the cost of adequate, effective sound attenuation measures currently is unknown.

Finally, the Lease includes first floor restaurant and retail spaces that RBC is not using and has not prepared for operation. RBC plans to open a "farm-to-table" type restaurant in Suite 110 at some point. However, its members have never operated a restaurant, and the plan is vague. Suite 110 does not have electricity; the members disconnected and re-routed that suite's electrical source to supply power to REI.[6] RBC has no concrete plans with respect to Suite 107.

The members, and particularly Steve Duran, have put a great deal of time, money, and effort into the Bar/Restaurant. Duran spent between $120,000 and $180,000 of his own money in the last six months or so to finish the buildout. Before the trustee was appointed, the members also caused Railyard to spend hundreds of thousands of dollars on the project.[7] The Bar/Restaurant is nearly complete. Most major inspections have been performed, and only a few modifications are needed in the kitchen area. The members estimate the Bar/Restaurant could be ready to open in a few weeks. If it were successful, the Bar/Restaurant would generate $20,000 or so in monthly rent, which would be a huge benefit to the estate.

Further, there is no dispute that Suite 210 would be difficult to re-let: it is very large, it is on the second floor (much less desirable for retail than the first floor), and the entrance is near the back of the Market Station building.

---

[6] Mr. Steve Duran testified that REI's electrical issue was caused by building subsidence, for which he asserts the City of Santa Fe is to blame.

[7] Railyard's books and records show that about $1,800,000 has been spent on the Bar/Restaurant space. There may have been a pre-bankruptcy agreement between Railyard and RBC to transfer the tenant improvements to RBC at some point, but on the Railyard petition date the assets were on Railyard's books.

To avoid rejection, RBC has stated that it would waive any entitlement to abate rent after March 1, 2017, except RBC refuses to pay rent on Suite 110 until it has electricity.[8]  If the waiver was intended as a carrot, RBC's bankruptcy filing was a stick.  The Court finds RBC filed the bankruptcy petition to delay possible rejection of the Lease.  Aside from RBC's dispute with the Railyard trustee, there is no evidence that RBC has issues with any creditors or needs to reorganize its business or liabilities.

Immediate resolution of the Lease rejection motion is important to both bankruptcy estates. Railyard is losing many thousands of dollars in potential rent every month because Suites 107, 110, and 210 are tied up and not producing rent.  Until this issue is resolved, the trustee cannot effectively administer Railyard's estate.  RBC's members have also spent a lot of time and money to open the Bar/Restaurant, and are determined to continue until the issue is resolved.  Further, RBC has contacted about 43 people about working at the Bar/Restaurant, and they deserve to know whether and when they will start.

## II.   DISCUSSION

### A.   Stay Relief.

The Court will grant a party relief from the automatic stay based on a showing of "cause." 11 U.S.C. § 362(d).  Cause for relief from the automatic stay under 11 U.S.C. § 362 "is a discretionary determination made on a case-by-case basis."  *In re Carbaugh,* 278 B.R. 512, 525 (10th Cir. BAP 2002) (quoting *Pursifull v. Eakin,* 814 F.2d 1501, 1506 (10th Cir. 1987)).  *See also Franklin Sav. Ass'n v. Office of Thrift Supervision,* 31 F.3d 1020, 1023 (10th Cir. 1994) (appellate court reviews trial court's decision on stay relief under an abuse of discretion standard).

---

[8] The members are relying on a settlement with an unrelated chapter 11 debtor to start making rent payments in March 2017.

-8-

The determination is often informed by the factors in *In re Curtis,* 40 B.R. 795 (Bankr. D. Utah 1984). *Curtis* is not particularly applicable here, since the Court presides over both cases. However, the factors addressing the potential interference with RBC's bankruptcy case, delay, and the impact on the parties are relevant and favor stay relief.

RBC's primary bankruptcy objective and reason for resisting stay relief is to delay resolution of the trustee's rejection motion. RBC hopes the delay will allow it to open the Bar/Restaruant, demonstrate profitability, and start paying rent. In such an event, RBC believes the Court would be less likely to approve rejection of the Lease. The Court appreciates the work Steve Duran put into the business, and why RBC would do everything possible to maintain its rights under the Lease. However, the purpose of the automatic stay is to give the debtor a breathing spell from its creditors while it attempts to reorganize or liquidate. *In re Calder,* 907 F.2d 953, 956 (10th Cir. 1990) (the stay provides a breathing spell from creditors); *In re Dawson,* 390 F.3d 1139 (the stay is meant to give debtors an opportunity to reorganize and put their finances back in order). The stay is not meant to allow a debtor to delay trial until the underlying circumstances improve and it is better situated to win. The Court also notes that RBC has leased the Bar/Restaurant space for nearly three years without paying rent, and had represented to Thorofare in December, 2014 that the Bar/Restaurant was close to opening.

To the extent RBC resists stay relief because it wishes to assume the Lease in its own bankruptcy case, the objective is futile. A number of cases have held that a tenant debtor's attempt to assume a lease does not affect the landlord debtor's ability to reject the lease. *See, e.g., In re Noranda Aluminum, Inc.*, 549 B.R. 725 (Bankr. E.D. Mo. 2016); *In re Old Carco*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009). The Court agrees. Stay relief therefore would not interfere with RBC's bankruptcy case. Denying stay relief, on the other hand, would interfere with Railyard's case

because ruling on the trustee's Lease rejection motion is vital to how that estate will be administered.

Consequently, the stay will be modified to allow the trustee to litigate the Lease rejection motion to conclusion.

    B.    <u>Lease Rejection Under 11 U.S.C. § 365</u>.

        1.    <u>Legal Standard</u>. A trustee may assume or reject executory contracts, subject to bankruptcy court approval. 11 U.S.C. § 365(a).[9] The business judgment test determines whether the Court should approve a proposed assumption or rejection. *In re Tilco, Inc.*, 558 F.2d 1369, 1373 (10th Cir. 1977); *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513 (1984) (business judgment test applies to authorize rejection of an ordinary executory contract); *In re Western Wood Products, Inc.,* 2013 WL 1386285, *21 (Bankr. D.N.M.) (citing *Tilco* and applying the business judgment test).

The test is not particularly strict. *In re Mile Hi Metal Systems, Inc.,* 899 F.2d 887, 896 n. 13 (10th Cir. 1990) ("We do not consider the 'business judgment test' to be a strict standard to meet") (quotations omitted). Deference is given to the trustee's decision, provided it demonstrates "that rejection … will be likely to benefit the estate." *Id. See also Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985) (articulating a deferential "benefit to the estate" standard); *In re: Genco Shipping & Trading Limited,* 509 B.R. 455, 463 (Bankr. S.D.N.Y. 2014) ("A court should defer to a [trustee's] decision that rejection of a [lease or] contract would be advantageous."); *In re Malden Mills Industries, Inc.,* 303 B.R. 688, 701 (1st Cir. BAP 2004) (courts will generally not second-guess a trustee's business judgment regarding whether the assumption or rejection of a lease will benefit the debtor's estate).

---

[9] All statutory references are to 11 U.S.C.

An alternative articulation of the test is that the Court will approve a proposed assumption or rejection unless it is manifestly unreasonable or derives from bad faith, whim, or caprice. *Western Wood,* 2013 WL 1386285, at *21 (court will not interfere unless the decision is "so manifestly unreasonable that it could not be based on sound business judgment") (quoting *Lubrizol Enterprises, Inc.,* 756 F.2d at 1047); *In re Sabine Oil & Gas Corp.,* 550 B.R. 59, 75 (Bankr. S.D.N.Y. 2016) (court will defer to debtor's decision to reject unless it is "the product of bad faith, whim, or caprice"); *In re Cook,* 2012 WL 5408905, *11 (Bankr. D.N.M.) (same).

        2.    <u>Analysis</u>. The Court is faced with unhappy alternatives. On one hand, the Lease terms are very unfavorable to the landlord. The third amendment, in particular, rendered the Lease unworkable from the landlord's perspective. If Lease rejection is denied and RBC enforced the Lease terms as written, it could arguably occupy 27,000 square feet of the Market Station indefinitely without paying rent. The Lease also ties up two desirable ground floor suites RBC is not currently using, developing, or subleasing. The trustee's decision to reject such a Lease is not manifestly unreasonable or a product of bad faith, whim, or caprice.

On the other hand, RBC is willing to waive its entitlement to rate abatement on Suites 107 and 210, and RBC could be an appropriate tenant for Suite 210, assuming sound attenuation issues can be resolved. The proposed rent ($12.50 a square foot) is a market rate for the second floor space. It likely would be difficult for the trustee to find another tenant willing to pay that amount for the suite. Problematic lease terms aside, the Court agrees with RBC's argument that its tenancy could benefit Railyard's estate.

After carefully considering all evidence and outcomes, the Court concludes it has no choice but to approve rejection of this particular Lease. RBC's proposed waiver is (the Court hopes) a good start toward negotiation of a new lease of Suite 210, but does not address some of the more

problematic provisions.  For example, even though RBC conditionally waived its right to abate rent because of Railyard's failure to pay for all tenant improvements, the obligation remains, and RBC could still potentially demand repayment of at least $120,000-$180,000 from Railyard.  The waiver also had no effect on the lease term, lack of guarantee or security deposit, fixed rental rate, or operating requirement.  The thorny problem of what to do with Suites 107 and 110 is not addressed.  Sound attenuation is not addressed.  The general lack of trust in RBC's management is not addressed.  Those critical issues could perhaps be dealt with when negotiating a new lease of Suite 210, but are not resolved by RBC agreeing to limit its rent abatement rights.

Overall, the trustee's decision to reject the Lease is well within his sound business judgment.

C.      Mediation.

The Court is inclined to think that one potential positive outcome for the estate, creditors, and equity holders would be for the trustee negotiate a new lease of Suite 210 with RBC.  The prospect of a successful business in Suite 210, paying about $20,000 a month in rent plus its share of CAM charges, is very appealing.  Such a result would add a lot of value to the Railyard estate, help ensure Thorofare is paid in full (and could receive substantial monthly payments in the interim), and possibly result in a solvent estate.  Further, this course of action frees Suites 107 and 110 for leasing to suitable tenants.  If tenants can be found for those two suites, the estate could generate an additional $18,000 or more per month in rent.

The Court understands the problems the trustee faces in negotiating a new lease with RBC.  At the end of the day, the problems may be insurmountable, but it is not clear from the Court's vantage point that they are.  Because the benefits of a deal could be so substantial, the Court believes the trustee and RBC should make all commercially reasonable efforts to reach an

agreement. The Court therefore will enter a separate order requiring RBC, the trustee, Thorofare, and REI to attend a mediation as soon as practicable.

D. Possession of the Premises.

Based on the history of this case and some of the arguments of counsel, the Court is not sanguine that possession of the leased premises will be turned over without further hearings and orders. Nevertheless, because issues related to post-rejection possession were not expressly plead or litigated, the Court will not rule on them now. If mediation fails, the Court will schedule a hearing on short notice to address any unresolved issues of possession or ownership of tenant improvements and/or personal property. Pending mediation and further Court order, the parties are directed not to take any action that would damage the premises or any improvements, fixtures, or personal property thereon.

III. CONCLUSION

The Lease in its current form is unreasonable and unworkable; the trustee properly exercised his business judgment to reject it. The trustee's motions to approve the lease rejection and for stay relief will be granted. The Court will order the parties to mediate the terms of a new lease for Suite 210 and make every reasonable effort to come to terms. Separate orders will be entered on these matters.

_____
David T. Thuma
United States Bankruptcy Judge

Entered: December 2, 2016

Copies to:

Tom Walker
500 Marquette Ave NW, Ste. 650
Albuquerque, NM 87102

Ben Thomas
Katharine C. Downey
P.O. Box 1945
Albuquerque, NM 87103

Eric Nicholas Ortiz
510 Slate Ave. NW
Albuquerque, NM 87102

Charles Hughson
P.O. Box 1888
Albuquerque, NM 87103

Michael Daniels
P.O. Box 1640
Albuquerque, NM 87103